JIM JOHNSON *v.* THE STATE.

1. PRACTICE—THE "RULE."—To the trial court is confided the discretion of enforcing the "rule" against witnesses, and its action will not be revised by this court in the absence of a showing of abuse.

2. SAME.— Ordinarily expert witnesses, and witnesses who are attorneys in the case, and those called to testify to a witness' reputation for truth and veracity, are exempt from the "rule."

3. SAME.— When medical experts are called solely as such the better practice is to exempt them from the "rule," in order that they may hear the whole evidence touching the matter respecting which they are called to testify; but where this is not done an hypothetical case embracing the facts in evidence may be submitted for their opinion.

4. SAME.— But where, as in this case, medical witnesses were not called as experts, but merely as witnesses to give their evidence of the mental capacity of the defendant derived from a personal acquaintance with him, their subjection to the operation of the rule was not error.

5. EVIDENCE— INSANITY.— To support a plea of insanity, the evidence must be such as to satisfy the minds and consciences of the jury to

the extent that they can say he should be, and is, acquitted upon that ground. Should it fail to so satisfy them, their finding is conclusive and will in no case be reversed unless the finding is most clearly and directly against the evidence. (Hurt, J., dissenting.)

Appeal from the District Court of Johnson. Tried below before the Hon. J. Abbott.

The defendant was charged by bill of indictment with an assault with intent to murder J. H. Daniels, in Johnson county, Texas, on the 7th day of December, 1880. His trial resulted in conviction, with punishment assessed at two years in the penitentiary.

The substance of the testimony of J. H. Daniels, the first witness for the State, was, that at the time of the shooting he lived with his brother, Angus Daniels, about two miles south of the town of Grand View, Johnson county, and was engaged with him in farming. There was a house in the field, about 300 yards from the main residence, stored with 700 or 800 pounds of seed cotton, and some beds in which the witness and three of his nephews slept at night. On the night of the 8th of December, 1880, at about 8 o'clock, the witness left his brother's house, alone, going to the house in the field to go to bed. He passed around a pile of cotton, as he entered the door, and when he had made one step into the first room he was fired upon by some one, the shot taking effect in the right shoulder. The shot was fired from a shot-gun at close range. The witness immediately clutched the gun, and after some struggling wrested it from his assailant. The latter escaped, saying nothing, but making a noise that sounded something like "bow-wow-wow." The witness followed him ten or twelve steps, attempting to get a shot, but the man escaped in the darkness. Presently the witness' brother Angus arrived, and witness gave him the gun,— a double-barreled shot-gun,— and showed him the direction in which the man

ran.  The witness also described the topography of the
vicinity, which is immaterial in explanation of the lead-
ing features of the testimony.  The witness had never
known nor heard of the defendant, nor seen him to his
recollection.

A. P. Daniels testified, for the State, that when his
brother J. H. Daniels left his house going to the field-
house to bed, on the night of the shooting, he went out to
his horse-lot, and while there heard the report of a gun
from the direction of the field-house, and immediately
went there, and found J. H. Daniels standing some dozen
steps from the door, with a gun in his hand.  He told
witness that he was shot, and the direction taken by the
man who did the shooting.  In the house he found a
coarse black hat, of medium size, rather low-crowned
and narrow-brimmed, and considerably worn.  He went
in the direction indicated by his brother, as far as a neigh-
borhood gin, and inquired for the man but could hear
nothing of him.  He delivered the gun to Esquire Boyd
the next day, and had since seen it in the hands of N. H.
Cook.  Had never seen the defendant before the shooting
that he knew of.

W. J. Brigance was next introduced by the State.  The
substance of his testimony was that he lived in the same
enclosure, and some 500 or 600 yards from the house in
which J. H. Daniels was said to have been shot.  Going
out of his house on the morning after the shooting, just
after breakfast, at about an hour by sun, he saw a man
standing in the path which led from a lot up to his house,
about forty feet from the house.  He had never seen the
man before, but recognized him on the trial as the
defendant.  He was bare-headed, seemed much excited,
but was not, so far as witness could see, wounded.  He
asked the witness if he could give him a hat, saying that
he had lost his during the night.  The witness went into
the house, brought out a hat and gave it to him.  He

then asked the witness the way to Grand View, and getting directions, left. The witness saw him again about ten o'clock on that same day in Grand View. He was then wounded and under arrest.

Mrs. Mary E. Deckard testified, for the State, substantially that she had known the defendant for about three years. In December, 1880, he was living on the Robertson place, about three miles south from Cleburne, in Johnson county. It is gathered from the testimony of this witness that herself and children also occupied the house in which defendant lived. He owned a wagon, a gray and a brown horse, a shot-gun and some other property. The witness employed him to take herself and children to her son's in Dallas county, and they started in the wagon drawn by the horses described, on the evening of December 6th, 1880. Besides some bed-clothing the defendant took along a double-barreled shot-gun, locking up his house, to which he was shortly to return. They made about ten miles the first evening and camped. The next being a severely cold day, they traveled but about five miles and went into camp near Mr. Hamilton's place, about 200 yards from Smith's gin. (This gin is about three miles from the house in which the shooting was done.) Mr. Hamilton came to the camp after supper that night, and engaged the defendant in conversation for a short time. The witness and her daughter retired that night between 8 and 9 o'clock; the defendant a little later. About 11 o'clock the witness waked up and saw the defendant sitting up on the foot of his bed. She asked him if he was not cold, and he replied "not very," but that he was warming his feet. The witness went to sleep again and did not wake up until about daybreak, when she called to defendant, telling him that some horses were eating his corn. The defendant did not answer, and she discovered that he was gone; also that two of the quilts of which he had made his bed, his gray

horse, one bridle and his shot-gun were gone. She waited until about 10 o'clock about the camp, and then employed Mr. Hamilton to take herself, daughter, wagon and the remaining horse back to Cleburne.

From about 11 o'clock on the night of the 8th of December, when she saw the defendant sitting up on his bed, until the next evening, that of the 9th, she saw nothing of the defendant. On that evening she saw him in a drug store in Cleburne. She did not know what caused him to leave camp on the night of the 8th. On that night when he was sitting by the fire he told the witness that he felt like he was going to be mobbed. The witness assured him that he was in no danger from any-one, and asked him to be quiet. He spoke of being mobbed several times. The witness had often known the defendant to act very strangely. He would frequently get up from his bed at night, apparently asleep, and leave the house. Several times he got outside the yard gate, and the witness' son, who slept in the same room with him, followed and brought him back. At such times he would not heed calling, but when touched would rouse up and return. On one occasion during the past fall — that of 1880 — he got up and awakened the household by chopping with a hatchet on the end of the house. He wore a common coarse black hat, with rather low crown and narrow brim. The witness had never known him to use intoxicating liquors.

L. J. King was introduced for the State, and testified that a gun which had that morning been shown him by A. P. Daniels was the same gun he had seen in the pos-session of the defendant during the preceding summer. This witness stated that the defendant moved away from the Robertson place where he had been living for three years, about the last of November or first of December, 1880, taking all his effects, or at least leaving nothing in his house. This witness regarded the defendant as a man

of good sense, and thought he had sense enough to take care of his own business and make a good farm hand, and enough to know it was wrong to shoot a man.

Z. Hamilton, placed on the stand by the defense, corroborated Mrs. Deckard as to the party camping near his house, his visit to the camp at night and his employment next day to take Mrs. Deckard, child, wagon, and the brown horse to Cleburne. He testified to some rambling conversation he had with the defendant, in which the latter contradicted himself somewhat in his statements to the witness. He could not positively identify the man in the camp and the defendant as one and the same, and expressed no opinion on this point.

The remainder of the testimony of the defense was directed to prove the defendant's imbecility, or his incapacity to distinguish right from wrong. Dr. Young, who had known and treated him, did not consider him insane or an idiot, but imbecile, incapable, when laboring under some strong mental emotion, of distinguishing right from wrong, but when in mental repose possessed of sufficient reason to know the wrong of shooting a man. Dr. Keating, on the contrary, pronounced the defendant insane, and not, in his opinion, a reasonable creature. He had been the regular physician of the defendant for some years, and related some of the symptoms upon which he based his opinion.

Other non-professional witnesses were introduced, among whom was N. H. Cook, who had often had business transactions with defendant. He thought the prisoner capable of discerning right from wrong when not laboring under violent mental emotion, but, when so afflicted, entirely destitute of such reason.

*D. T. Bledsoe*, for the appellant.

*H. Chilton*, Assistant Attorney General, for the State.

WHITE, P. J.   It has been repeatedly decided with regard to matters of practice in placing witnesses under the rule at the request of either party, as is provided by art. 662, Code Crim. Proc., that they are confided mainly to the discretion of the trial judge, and are not revisable in the absence of a showing of abuse.   Clark's Crim. Laws of Texas, p. 511, note 199; *Estep* v. *State*, 9 Texas Ct. App. 366.   Ordinarily witnesses who are summoned as experts, as well as attorneys in the case and witnesses called to testify to the character for truth and veracity of a witness, are excepted from the rule and permitted to remain in the court room while the rest are sent away. *Brown* v. *State*, 3 Texas Ct. App. 295.   When medical experts are called solely as such, the better and most satisfactory practice would be to allow them to remain in the room and hear the testimony of all the other witnesses, in order that from the whole testimony they may be able to determine from the evidence itself the matter upon which their opinion is desired.   Still, where this has not been done, a hypothetical case embracing the facts in evidence may in all cases be submitted to them for their opinion.   *Webb* v. *State*, 9 Texas Ct. App. 490; *Hunt* v. *State*, 9 Texas Ct. App. 166.

In the case before us the medical witnesses Drs. Keating and Young appear, from their testimony as exhibited in the statement of facts, to have been called, not as experts to declare a scientific opinion based upon the other testimony in the case, but simply as witnesses to give their own evidence of the condition of defendant's mental capacity as derived from a personal acquaintance with him.   Such being the attitude they occupied with relation to the case, it is not manifest that the court abused its discretion in the slightest by subjecting them to the operation of the rule.

The defense relied on was not so much insanity as mental imbecility, or incapacity to distinguish right from

.wrong.    Upon this point the testimony is conflicting. Dr. Keating is the only witness who believes that the defendant is not a reasonable creature, but insane; the other witnesses believe him capable of distinguishing right from wrong, and accountable for his acts when not under the influence of some powerful emotion of mind. The witness King, who knew him well and lived in his immediate neighborhood, said he was a man of good sense,— had sense enough to attend to his own business and make a good farm-hand, and that he had never seen anything wrong with him.

The charge of the court upon this branch of the case presented the law in explicit and ample terms, as now understood in this State, and the jury were fully apprised of their duty in the premises.  The evidence under such proper instructions as to the law has failed to satisfy them that defendant's mental incapacity was such as to render him irresponsible for his acts.  To support a plea of insanity the evidence must be such as to satisfy the minds and consciences of the jury to the extent that they can say he should be and is acquitted upon that ground. *Webb* v. *State*, 9 Texas Ct. App. 490; *King* v. *State*, 9 Texas Ct. App. 557.  Should it fail so to satisfy them, their finding is conclusive and will in no case be reversed, unless the finding is most clearly and directly against the evidence.

We have been unable to see any such error in the record as would call for a reversal of the judgment, and it is therefore affirmed.

*Affirmed.*

HURT, J., does not concur in this opinion.